**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PEOPLE FOR THE ETHICAL TREATMENT
OF ANIMALS, INC.
501 Front Street
Norfolk, VA 23510,

                Plaintiff,

    v.

RANDY CLARKE,
General Manager
Washington Metropolitan Area Transit Authority
300 7th Street, SW
Washington, DC 20024,

                Defendant.

No. 26-cv-1979

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Violation of First and Fourteenth Amendment Rights)

**INTRODUCTION**

1.    The Washington Metropolitan Area Transit Authority ("WMATA") operates one of the nation's largest transit systems. Paid advertising in trains, in and on buses, and in Metro stations reaches more than 90 percent of the people who live and work in the area on a daily basis. People for the Ethical Treatment of Animals, Inc. ("Plaintiff" or "PETA") would like to exercise its First Amendment rights to solicit donations in support of Plaintiff's charitable mission via anodyne ads to these mass transit users in the Washington, D.C. area, such as through ads like the following:



2.    For reasons unknown to PETA, but that seem to only be explicable as stemming from a deeply held ideological bias against what it perceives as PETA's underlying mission,

WMATA, under the leadership of Defendant Randy Clarke ("Defendant"), appears to have instituted a blanket ban on any ads from PETA. WMATA enforces this ban no matter how anodyne and compliant with WMATA policies PETA's proposed ads may be. Because of this animus, WMATA consistently rejects PETA's ads, even though it runs similar ads from other advertisers. WMATA's rejections of PETA's ads violate WMATA's own rules, which WMATA ignores when abiding by them would be inconvenient—or run afoul of WMATA leadership's own apparent policy views.

3. By rejecting advertisements PETA submits that merely solicit donations in support of PETA's charitable mission, WMATA violates Plaintiff's First and Fourteenth Amendment rights. WMATA's advertising Guidelines, which explicitly or implicitly incorporate such viewpoint discrimination, are unconstitutional for the same reason. This Court should check WMATA's viewpoint discrimination and its vague and inconsistent application of its own advertising policies.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claims arise under the Constitution and laws of the United States.

5. Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the acts and omissions complained of occurred in this District.

6. This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

7. Defendant's constitutional violations are actionable pursuant to 42 U.S.C. § 1983.

## PARTIES

8. Plaintiff PETA is a Virginia nonstock corporation and is the largest animal rights organization in the world. Committed to fighting animal exploitation and asserting animals'

3

rights to have humans consider their best interests and to be free from suffering, PETA particularly advocates against the pain caused to animals by the food, clothing, domestic breeding, and entertainment industries, as well as by laboratory experimentation.

9. Defendant Randy Clarke is the General Manager of WMATA, which operates the second largest heavy rail transit system, the sixth largest bus network, and the fifth largest paratransit service in the United States, with an annual budget of nearly three billion dollars. The General Manager is WMATA's chief administrative officer and, subject to policy direction by the WMATA Board of Directors, is responsible for all WMATA activities. He is sued in his official capacity. With respect to all actions by WMATA alleged in this Complaint, he acted under color of law as an officer for WMATA.

**FACTS**

**Facts Relating to WMATA Advertising Generally**

10. WMATA sells advertising space in Metrorail stations, in Metrorail cars, and in and on Metrobuses. Advertising on WMATA has deep market penetration in the Washington, D.C. metropolitan area. WMATA estimates that its exterior bus advertising alone reaches 90 percent of that population daily, and that 98 percent of the public are familiar with the types of advertising found on buses and trains, and in Metro stations.

11. WMATA uses the services of a large media company, Outfront Media, Inc. ("Outfront"), to manage its advertising sales and placement. Prospective WMATA advertisers submit proposed advertisements to Outfront and sign contracts with Outfront detailing the type, size, placement, duration, and cost of their advertisements. WMATA is not a party to such contracts, but WMATA, not Outfront, makes the decisions about whether a proposed advertisement complies with WMATA's advertising Guidelines.

12. WMATA's advertising practices are governed by its Guidelines Governing

Commercial Advertising ("Guidelines").

13.    The Guidelines restrict the nature and content of advertising that WMATA accepts for its advertising space. WMATA most recently amended the Guidelines in November 2015. A true, accurate, and complete copy of the Guidelines is attached as Exhibit A.

14.    The Guidelines contain fourteen numbered restrictions, two of which are at issue in this action:

No. 9:    "Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."

No. 14:    "Advertisements that are intended to influence public policy are prohibited."

15.    On November 1, 2024—while facing numerous lawsuits over the Guidelines and WMATA's application of the Guidelines—WMATA implemented Internal Procedures and Interpretive Aids for Reviewing Proposed Commercial Advertising ("Interpretive Aids") which purport to "help WMATA's advertisement review panel … apply the Guidelines to all advertisements submitted for review by its third-party advertising vendor." A true, accurate, and complete copy of the Interpretive Aids is attached as Exhibit B.

16.    The Interpretive Aids were drafted by WMATA's counsel and were at least partially motivated by then-pending litigation challenging the Guidelines.

17.    The Interpretive Aids were not adopted pursuant to any formal WMATA process, nor were they reviewed by WMATA's Board of Governors prior to their implementation. WMATA's Board of Governors is responsible for establishing WMATA's policies.

18.    The Interpretive Aids are subject to change without notice at any time.

19.    The Interpretive Aids were not promulgated pursuant to any legal authority that would make them binding on WMATA or Outfront.

20.    Section IV.G.8 of the Interpretive Aids states "Guideline 9 does not prohibit

advertisements soliciting donations so long as the advertisement does not otherwise violate the Guidelines."

21.     Section IV.J of the Interpretive Aids makes clear that Guideline 14 is meant to exclude only advocacy ads addressed to public officials or that seek to put public pressure on public officials.

22.     The Interpretive Aids also purport to appreciate the distinction between educating the public about the availability or function of a product or service, on the one hand, and advocating for the legality or ethics of a product or service, on the other hand. For example:

>   a.  Under Interpretive Aids § IV.G.4, ads for media outlets are not to be disqualified "solely because the medium's content addresses political issues or contains political messages."
>
>   b.  Pursuant to Interpretive Aids § IV.G.5, ads for job openings are not to be disqualified "solely because the employer's missions, policies, practices, or tactics are [controversial]."
>
>   c.  Interpretive Aids § IV.G.6 makes clear that ads for goods or services are not to be disqualified solely "because others may be opposed to their purchase or use." That section goes on to clarify with the following example: "an advertisement from a charitable or religious organization that provides free meals or services to the poor is not prohibited because some people may be opposed to that organization."

23.     Guidelines 9 and 14 are implicitly viewpoint-discriminatory. They vest WMATA with unbridled discretion to determine what is or is not "an issue on which there are varying opinions," and what is or is not "intended to influence public policy."

24.     Despite implementing the Interpretive Aids, WMATA does not abide by the terms

of the Interpretive Aids, therefore reserving to itself unbridled discretion under the Guidelines. That unguided discretion authorizes and encourages discriminatory enforcement against what Defendant or WMATA considers controversial or unpopular viewpoints, and has resulted in discriminatory enforcement against such viewpoints.

25.    Guidelines 9 and 14 have been and, based on present practice, will continue to be applied in a viewpoint-discriminatory manner to reject Plaintiff's advertisements.

**Facts Relating to PETA's Ad Submissions**

26.    Public advertising is one of the major ways in which Plaintiff solicits donations. Prior to WMATA's adoption of its revised Guidelines in 2015, Plaintiff had run paid advertising campaigns on WMATA, including a campaign in September and October 2014 opposing the use of live monkeys for testing at the National Institutes of Health.

27.    On October 1, 2025, PETA submitted an advertisement to WMATA's agent, Outfront, for placement in WMATA's stations and vehicles. The advertisement included generic, non-stylized, non-suggestive images of a healthy cat, pig, dog, and chicken appearing on a plain black background, and a QR code linking to Plaintiff's donation webpage. The text on the ad merely says "Help Us Help Them. Donate to PETA." The advertisement has no intended or plausible meaning other than to solicit donations to PETA for its charitable animal protection programs. A true and accurate copy of the subject ad is reproduced below:



28.      On October 3, 2025, Outfront informed PETA that WMATA rejected the ad without any explanation other than the conclusory claim that the "ad review panel has determined that the attached proposed advertisement is prohibited by Advertising Guideline 9." Outfront also reported WMATA claimed the ad violates Advertising Guideline 14.

29.      On June 27, 2025, Plaintiff submitted an advertisement to WMATA's agent, Outfront, for placement in WMATA's stations and vehicles. The ad included a generic, non-suggestive, and non-stylized image of a healthy pig, a QR code linking to Plaintiff's donation webpage, and a picture of the cover of Plaintiff's "vegan starter kit," which is a collection of recipes and other information helpful to those curious about veganism. The text on the ad merely invited the public to become a PETA member,  and offered a free vegan starter kit as an expression

of Plaintiff's gratitude for their support.  Like many charities, Plaintiff refers to its donors as "members." The ad's invitation to become a PETA "member" is a donation solicitation, which is expressly permitted pursuant to Section IV.G.8 of the Interpretive Aids. The advertisement has no intended or plausible meaning other than to solicit donations to PETA. A true and accurate copy of the subject ad is reproduced below:



30.    On July 3, 2025, Outfront informed PETA that WMATA rejected the ad without any explanation other than the conclusory claim that the "ad review panel has determined that the attached proposed advertisement is prohibited by Advertising Guideline 9."

31.    On May 28, 2025, PETA submitted an advertisement to WMATA's agent, Outfront, for placement in WMATA's stations and vehicles. The advertisement included generic, non-stylized, non-suggestive images of healthy pigs in a generic urban setting, a QR code linking to Plaintiff's donation webpage, and an image of a banner stating the indisputable and uncontroversial statement of fact that "pigs can't fight for pigs' rights," with the words "that's why we're here. Please donate to PETA" directly underneath. The plain text of the advertisement has no intended or plausible meaning other than to solicit donations to PETA. A true and accurate copy of the subject ad is reproduced below:

9



32.    On May 30, 2025, Outfront informed PETA that WMATA rejected the ad without any explanation other than the conclusory claim that the "ad review panel has determined that the attached proposed advertisement is prohibited by Advertising Guideline 9."

33.    None of the above ads include any sexual, violent, gory, or otherwise controversial imagery. None of the above ads proposed by PETA ask members of the public to believe in or advocate for any ideology. None of them include any public policy arguments. While some of the above ads state basic facts that are beyond any reasonable dispute—such as animals exist, are not human, and are the subject of PETA's charitable mission—none of them ask the public to do anything beyond donating to PETA. Indeed, PETA's October 1, 2025, proposed ad strips things down to the absolute minimum necessary to reasonably communicate a donation request—a plain background, non-evocative imagery, and a bare solicitation.

34.    PETA still wishes to place the same advertisements referenced in paragraphs 27 through 32 herein, and similar advertisements, in WMATA advertising spaces. PETA is suffering irreparable injury during the time its advertisements are not permitted to run on WMATA advertising spaces.

35.    While rejecting the above ads proposed by PETA, WMATA has accepted and displayed many advertisements that reflect its ideological disagreement with what it perceives as PETA's underlying mission—which, for example, are intended to influence riders to buy, do, and

support things like eating animal-based foods and attending circus performances at which animals are made to perform in unnatural ways. But while WMATA chooses to promote those third-party viewpoints, it selectively punishes PETA for what it perceives to be PETA's opposing viewpoints on these issues—despite the fact that the above ads PETA proposed do not engage these or any other issues at all.

**WMATA'S Arbitrary and Inconsistent Enforcement of Guideline 9**

36.     WMATA continues to arbitrarily and inconsistently enforce Guideline 9 (which prohibits ads "intended to influence members of the public regarding an issue on which there are varying opinions").

37.     In December 2024, the Salvation Army submitted two ads to Outfront for review. One of these ads contains a link to SalvationArmyNCA.org; a true and accurate copy of that ad is reproduced below. WMATA's review panel approved the Salvation Army's ads on December 12, 2024, even though they are comparable to Plaintiffs' ads in all material respects in that they merely identify the charity, solicit a donation, indicate generally what the donation would be used for, and link to the charity's website, all in a completely anodyne presentation.

11



38.    Despite rejecting Plaintiff's ads soliciting donations, WMATA has run ads from organizations other than the Salvation Army which also solicit charitable donations and/or volunteers. True and accurate examples of ads actually run by WMATA include a donation solicitation from Live Nation's Global Relief Fund, and a volunteer solicitation from Court Appointed Special Advocates' (CASA) DC section:





39.    In December 2024, World Pride DC submitted to Outfront for review a series of advertisements encouraging the public to attend a festival. A true and accurate copy of one such ad is reproduced below. WMATA's review panel reviewed these ads and rejected them on

13

December 27, 2024, on the basis they violated Guideline 9, even though they are encouraging attendance and/or support of a festival to raise money for a charitable cause.



40.     Despite rejecting the above ad, in 2025 WMATA displayed signs on its Liveboards and Metro cars supporting Pride Month. True and accurate photos of such signs are reproduced below.

14





41.    In the winter of 2024, WMATA ran an advertisement sponsored by the Black Coalition Against COVID-19 inside WMATA buses, encouraging persons to wear masks despite

the necessity, effectiveness and utility of wearing masks as a means to mitigate COVID-19 being hotly contested within each of the scientific, government, and lay communities. A true and accurate copy of that ad is reproduced below.



42.    In July 2025, WMATA ran an ad by Power to the Patients that stated, "Can you find hospital prices? The law says hospitals must post their prices. But most ignore the law …" The ad also invited viewers to "JOIN OUR HEALTHCARE REVOLUTION. HOLD HOSPITALS ACCOUNTABLE" and contained a link to PowertothePatients.org. A true and accurate photo of the ad is reproduced below.



43.    In October 2025, WMATA ran an advertisement on its Metrobuses for Montgomery County, Maryland's Be Climate Smart Campaign. A true and accurate photo of the ad is reproduced below. The ad includes a link to MontgomeryCountyMD.gov/ClimateSmart, which, *inter alia*, encourages people to "Plan meals to reduce food waste."



44.    WMATA allowed Montgomery County, Maryland, to advertise material explaining how food choices affect the environment even though it had previously rejected ads from Veganuary.com on the same subject. Veganuary is a non-profit organization that encourages people worldwide to try a vegan lifestyle for at least the month of January.

45.    In December 2023, Veganuary submitted three ad designs to Outfront, which WMATA's review panel ultimately rejected under Guideline 9. True and accurate copies of these ads are reproduced below.






46.     Additionally, despite rejecting Plaintiff's and Veganuary's ads apparently because

they simply mention veganism, WMATA ran an advertisement from Axios about increased demand for donations of vegan foods. A true and accurate photograph of that ad is reproduced below.



**WMATA's Arbitrary and Inconsistent Enforcement of Guideline 14**

47.    WMATA continues to arbitrarily and inconsistently enforce Guideline 14 (which prohibits ads "intended to influence public policy").

48.    In November 2024, TikTok submitted a series of ads to Outfront for review. Each ad in this series contained a message related to veterans. WMATA's review panel reviewed these ads and rejected them on November 8, 2024, on the basis that they violate Guideline 14 (and also Guideline 9), even though they do not ask any public official, public employee, voter or citizen

to do anything to influence public policy in any way, but rather are expressing TikTok's support for private charities and encouraging others to do the same. True and accurate copies of these ads are reproduced below:

 

 

49.    In April 2025, Outfront ran ads in WMATA's Metro stations by NextEra Energy that state "American Energy Dominance" and "Unlocking America's Energy." True and accurate photographs of these ads are reproduced below. In February 2025, just before these ads ran in WMATA's Metro stations, President Trump issued an executive order declaring, "[i]t shall be the policy of my Administration to make America energy dominant" and establishing a "National Energy Dominance Council."



50.    In June 2025 through the present, WMATA has run ads on its Metrobuses for U.S. Customs and Border Patrol that ask the public to "BE AN AGENT OF ACTION" and "JOIN THE MISSION." True and accurate copies of such ads, including one that was vandalized, are reproduced below.





51.    In the summer of 2025, Outfront ran ads by Anduril on WMATA's Metrobuses that state "Rebuild the Arsenal" and "Command the Sea, Command the World." True and accurate

photos of buses displaying these ads are reproduced below. These ads were part of a broader campaign by Anduril to call for increased defense spending by the federal government to modernize the nation's military.





## CLAIMS FOR RELIEF

### Violation of the First Amendment of the U.S. Constitution

### U.S. Const. amend. I, amend. XIV; 42 U.S.C. § 1983; Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202

52.    In the following Claims, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment, and references to the Fifth Amendment include the comparable provisions of the Fourteenth Amendment.

### <u>First Cause of Action</u>
### First Amendment: Facial Unconstitutionality

53.    Plaintiff incorporates by reference all prior allegations of this Complaint.

54.    WMATA Guideline 9's vague standard is incapable of reasoned application and effectively vests WMATA with unfettered discretion to determine what constitutes "an issue on which there are varying opinions." Guideline 9 does not provide objective standards for distinguishing between permissible and impermissible advertisements in a non-arbitrary,

26

viewpoint-neutral manner. That unguided discretion authorizes and encourages subjective, discriminatory enforcement against unpopular or non-mainstream viewpoints, and it has been applied to exclude unpopular or non-mainstream viewpoints. This subjective, unfettered discretion, and the resulting viewpoint discrimination, applies to all advertising submitted to WMATA. Accordingly, Guideline 9 violates the First Amendment on its face.

55.     WMATA Guideline 14's vague standard similarly is incapable of reasoned application and effectively vests WMATA with unfettered discretion to determine what is "intended to influence public policy" Guideline 14 does not provide objective standards for distinguishing between permissible and impermissible advertisements in a non-arbitrary, viewpoint-neutral manner. That unguided discretion authorizes and encourages subjective, discriminatory enforcement against unpopular or non-mainstream viewpoints, and it has been applied to permit advertising that reflects viewpoints conforming to existing public policy while excluding advertising that reflects viewpoints at odds with it. This viewpoint discrimination applies to all advertising submitted to WMATA that relates to matters of public policy. Accordingly, Guideline 14 violates the First Amendment on its face.

56.     Despite the Interpretive Aids purporting to place reasonable limitations on WMATA's discretion under the Guidelines, WMATA ignores the Interpretive Aids or otherwise treats them as non-binding, rendering the Guidelines the sole policy by which WMATA determines which advertisements qualify for publication.

57.     As a result of Guidelines 9 and 14's inconsistency with the First Amendment, PETA has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, and it is entitled to declaratory and injunctive relief.

<u>**Second Cause of Action**</u>
**Fifth Amendment: Facial Unconstitutionality**

58.     Plaintiff incorporates by reference all prior allegations of this Complaint.

59.    WMATA Guidelines 9 and 14 are void for vagueness because the line between permitted and prohibited speech is not clearly defined. Neither advertisers, WMATA administrators, nor judges can reliably determine which advertisements comply with those Guidelines and which violate them.

60.    Despite the Interpretive Aids purporting to clarify the lines between permitted and prohibited speech, WMATA ignores the Interpretive Aids or otherwise treats it as non-binding, rendering the Guidelines the sole policy by which WMATA determines which advertisements qualify for publication.

61.    As a result of Guidelines 9 and 14's inconsistency with the Fifth Amendment, PETA has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, and it is entitled to declaratory and injunctive relief.

**Third Cause of Action**
**First Amendment: Viewpoint- or Speaker-Based Unconstitutionality as Applied**

62.    Plaintiff incorporates by reference all prior allegations of this Complaint.

63.    WMATA's rejection of PETA's advertisements on the ground that they violated Guideline 9, when WMATA has accepted numerous advertisements intended to influence members of the public on issues on which PETA's advertisements presented PETA's differing opinions, violated PETA's right to be free from viewpoint-based or speaker-based discrimination.

64.    WMATA's rejection of PETA's advertisements on the ground that they violated Guideline 14 violated PETA's right to be free from viewpoint-based or speaker-based discrimination, as evidenced in part by WMATA's acceptance of numerous advertisements sponsored by advertisers who seek to influence public policy on issues on which PETA's advertisements presented PETA's differing views.

65.    As a result of WMATA's inconsistent application of Guidelines 9 and 14, PETA has suffered and will continue to suffer irreparable harm, including the loss of its constitutional

28

rights, and it is entitled to declaratory and injunctive relief.

## REQUESTED RELIEF

Wherefore, Plaintiff respectfully requests that the Court

A.      DECLARE that Defendant's rejection of the advertisements submitted by Plaintiff was an unreasonable and improper application of WMATA's Guidelines Governing Commercial Advertising;

B.      DECLARE that Defendant's rejection of the advertisements submitted by Plaintiff violated Plaintiff's rights under the First and Fifth Amendments;

C.      ENJOIN Defendant, his employees, agents, successors, and assigns, and all persons acting in concert with him, from enforcing Guidelines 9 and 14 of WMATA's Guidelines Governing Commercial Advertising;

D.      ENJOIN Defendant, his employees, agents, successors, and assigns, and all persons acting in concert with him, from enforcing its Guidelines 9 and 14 against PETA and against the advertisements previously submitted by Plaintiff referenced in paragraphs 27 through 32 herein and any substantially equivalent advertisements that may be submitted by Plaintiff in the future;

E.      AWARD to Plaintiff its costs and reasonable attorneys' fees in this action; and

F.      GRANT such other and further relief as to the Court appears just and proper.


Date: June 4, 2026                              Respectfully submitted,



                                                Matthew Strugar
                                                Law Office of Matthew Strugar
                                                3435 Wilshire Blvd., Suite 2910
                                                Los Angeles, CA 90010
                                                323-696-2299
                                                matthew@matthewstrugar.com

                                                Aaron Frazier*
                                                Foundation to Support Animal Protection (PETA
                                                Foundation)

29

501 Front Street
Norfolk, VA 23510
(757) 622-7382
AaronF@PetaF.org

*Counsel for Plaintiff*

\*Counsel Will Seek Pro Hac Vice Admission

# Exhibit A

**Guidelines Governing
Commercial Advertising**

Adopted August 3, 1972
by
Board of Directors
Amended November 20, 2003 and November 19, 2015

Amended by
General Manager/Chief Executive Officer
Pursuant to Board Resolution Nos. 2015-55 and 2015-57

1.      All advertising shall comply with the spirit of all applicable laws and regulations of the various jurisdictions in which it is displayed unless the inconsistencies among the various jurisdictions prevents such compliance.  Advertising will not be accepted that is false, misleading or deceptive.

2.      Advertisers promoting contests shall insure the contest is being conducted with fairness to all entrants and complies with all applicable laws and regulations.

3.      Testimonials should be authentic and shall honestly reflect the response of the person making them.  (The sales contract shall provide for the indemnification of WMATA against action by any person quoted or referred to in any advertisement placed in the Metro system).

4.      Medical and health-related messages will be accepted only from government health organizations, or if the substance of the message is currently accepted by the American Medical Association and/or the Food and Drug Administration.

5.      Advertisers shall avoid illustrations or references which disregard normal safety precautions.

6.      Advertising offering premiums or gifts shall avoid representations which would enlarge the value of the item in the minds of the viewers.

7.     Use of Metro graphics or representations in advertising is subject to approval by WMATA.

8.     No implied or declared endorsement of any product or service or message by WMATA is permitted.

9.     Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.

10.     Advertisements of tobacco products are prohibited in accordance with Board Resolution 94-36.

11.     Advertisements that support or oppose any political party or candidate are prohibited.

12.     Advertisements that promote or oppose any religion, religious practice or belief are prohibited.

13.     Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited.

14.     Advertisements that are intended to influence public policy are prohibited.

2

# Exhibit B

**METRO INTERNAL PROCEDURES AND INTERPRETIVE AIDS**

**FOR REVIEWING PROPOSED COMMERCIAL ADVERTISING**

The following are the internal procedures and interpretive aids for the Guidelines Governing Commercial Advertising adopted by the Washington Metropolitan Area Transit Authority ("WMATA") on August 3, 1972, as most recently amended November 19, 2015 (the "Guidelines").[1]  These internal procedures and interpretive aids help WMATA's advertisement review panel ("Panel") apply the Guidelines to all advertisements submitted for review by its third-party advertising vendor ("Vendor").  WMATA reserves the right to revise or amend the internal procedures and interpretive aids without notice.

I.   Composition of WMATA's advertisement review Panel

   A.   WMATA shall utilize a three-person Panel to review advertisements that are identified by WMATA's third party advertising Vendor as potentially violating the Guidelines.  The Panel shall consist of one person from the Marketing Department and two attorneys from the Legal Department.

   B.   Each Panel member shall be generally familiar with the law governing advertising in non-public forums.

   C.   All members of the Panel shall review past advertisements that have been considered by the Panel to familiarize themselves with how the Guidelines have been applied in the past.

   D.   If the Panel is unable to reach a consensus on whether an advertisement violates the Guidelines, the advertisement shall be submitted to outside counsel with demonstrated extensive experience in First Amendment law for advice in order for the Panel to make a final determination.

II.  Submission of advertisements through third-party advertising vendor

   A.   All advertisements submitted for advertising through WMATA's third-party advertising vendor ("Vendor") shall be reviewed initially for compliance with the Guidelines by the Vendor.  If the Vendor believes an advertisement is prohibited by a Guideline or is unsure whether an advertisement may violate a Guideline, it shall submit the advertisement to the Panel for review and a decision.

   B.   Periodically, members of the Panel shall meet with any employees of Vendor responsible for initially reviewing advertisements to discuss the Guidelines and these internal procedures and interpretive aids.

   C.   Advertisements submitted in any language other than English shall be accompanied by a certified English translation.

III. Panel review of advertisements

   A.   When an advertisement is submitted to the Panel to determine if it complies with or violates the Guidelines, each member shall review the advertisement.

   B.   If any advertisement submitted to the Panel contains a link to a website, a QR code, or a reference to a website (for example, but not limited to, "check out our website for more information"), the Panel shall access the website and endeavour to review:

      1.   Any page linked directly from the advertisement;

      2.   Any homepage for the website;

      3.   Any page directly accessible from the above pages that purports to provide background information on the content, meaning, and/or purpose of the advertisement, which may include pages that describe the advertiser and their self-stated mission and/or purpose; and

      4.   Any page linked from one of the foregoing pages that suggests it contains content that would violate the Guidelines if it appeared on the face of the advertisement.

   C.   To the extent technically practical, download or otherwise save page(s) that the Panel reviewed in making its determination.  If a website contains content that does not download (for example, but not limited to, images or link titles), the page shall be printed or saved in another manner that preserves as much information as possible

_____

[1] Effective as of November 1, 2024.

from the reviewed pages.

D. If an advertisement does not include a link, QR code, or other reference to a website, the Panel generally will not consider the website during its review.  However, if any advertisement presents information that is not readily known to or understood by the Panel, the Panel may perform enough research regarding the information presented by the advertisement to educate itself in order to make an informed decision as to whether the advertisement violates the Guidelines.

E. The Panel will not provide advisory opinions or feedback on potential advertisements.

F. Panel decisions are final.  The Panel will not consider requests for reconsideration or additional explanation.

IV. Guidance for determining if advertisements violate the Guidelines

A. The Panel shall apply the Guidelines consistently.  It shall not reject advertisements because of the particular viewpoint stated or the identity of the advertiser.

B. An advertisement that otherwise violates the Guidelines is prohibited even if it also encourages or promotes the purchase or use of goods or services.

C. An advertisement for an educational institution is not prohibited solely because it refers to its mission or describes itself using general terms that do not refer to a specific issue (for example, but not limited to, describing itself or its educational offerings as "diverse," "traditional," or guided by religious tenets) so long as the advertisement does not otherwise violate the Guidelines.

D. Interpretive aids for Guideline 1: "All advertising shall comply with the spirit of all applicable laws and regulations of the various jurisdictions in which it is displayed unless inconsistencies among the various jurisdictions prevents such compliance.  Advertisements will not be accepted that are false, misleading or deceptive."

   1. Advertisements that are obscene, indecent, or defamatory, that depict graphically violent or graphically sexual material, or that are otherwise legally actionable are prohibited.

   2. Advertisements that contain profanity or fighting words are prohibited.  "Profanity" is grossly offensive language that is considered a public nuisance or as otherwise defined by the Federal Communications Commission.  "Fighting words" are words that naturally tend to provoke violent resentment, inflict injury, or incite an immediate breach of the peace.

   3. Upon request, advertisers must provide evidence demonstrating compliance with this Guideline.

   4. All advertisements must clearly identify the entity submitting the advertisement. Advertisements that appear as if a third party is the advertiser are prohibited.

E. Interpretive aids for Guideline 4: "Medical and health-related messages will be accepted only from government health organizations, or if the substance of the message is currently accepted by the American Medical Association and/or the Food and Drug Administration."

   1. "Medical and health-related messages" are statements that refer to particular drugs, supplements, medical products, treatments, or other health-related services to combat illnesses, diseases, or health conditions and make representations or statements about the efficacy, benefits, or side effects of the drugs, supplements, medical products, treatments, or other health-related services being advertised.

   2. "Medical and health-related messages" must be both (a) factual in nature or presented as opinions of experts, medical professionals, or government officials; and (b) capable of verification by the American Medical Association and/or the Food and Drug Administration.

   3. Guideline 4 does not prohibit advertisements that identify a particular drug, supplement, medical product, treatment, or other service without making the type of representations or statements described in this section.

   4. Guideline 4 does not prohibit advertisements for fitness products or services, such as gyms, yoga studios, or other fitness training, unless the advertisement makes the type of representations or statements described in this section.

   5. Guideline 4 does not prohibit advertisements for a weight-loss program unless the advertisement contains the

types of representations or statements described in this section.

6.  Upon request, advertisers must provide evidence demonstrating compliance with this Guideline.

F.  Interpretive aids for Guideline 8:  "No implied or declared endorsement of any product or service or message by WMATA is permitted."

1.  All advertisements must clearly identify the entity submitting the advertisement to avoid any confusion regarding whether it is a WMATA or WMATA-endorsed advertisement.

G.  Interpretive aids for Guideline 9:  "Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."

1.  The Panel determines an advertisement's intent from review of the face of the advertisement and review of any relevant websites in accordance with section III.

2.  An "issue on which there are varying opinions" does not mean any topic on which people might disagree. For example, an advertisement for a sports team does not involve an "issue on which there are varying opinions" merely because some people support other teams.  Rather, an "issue" for purposes of Guideline 9 is "a point, matter, or dispute, the decision of which is of special or public importance[.]"  (Dictionary.com definition of "issue.")  Advertisements that include such issues generally promote a message to the public about substantive ethically, socially, or politically controversial or divisive topics, as illustrated in this section.

3.   Guideline 9 prohibits the following types of advertisements:

a.  Supporting, opposing, or promoting a political party;

b.  Supporting, opposing, or promoting any person holding any government position or any candidate for such a position;

c.  Supporting, opposing, or promoting a ballot measure or proposed measure;

d.  Supporting, opposing, or promoting a law, ordinance, regulation, or policy or proposed law, ordinance, regulation, or policy;

e.  Supporting, opposing, or promoting a constitutional amendment or amendments or a proposed constitutional amendment or amendments;

f.  Supporting, opposing, or promoting a governmental investigation or proposed government investigation;

g.  Supporting, opposing, or promoting a governmental action or inaction, other than offering goods and/or services to the government;

h.  Supporting, opposing, or promoting any civil, criminal, or administrative proceeding, or any ruling in such a proceeding;

i.  Supporting, opposing, or promoting a strike, walkout, boycott, divestment, embargo, or similar activity;

j.  Supporting, opposing, or promoting a policy or policies of a business or nonprofit entity other than encouraging or promoting the purchase or use of goods or services of the advertiser;

k.  Supporting, opposing, or promoting any foreign nation, group of foreign nations, foreign interest, or related entity, or any policy of or action/inaction of any foreign nation, group of foreign nations, foreign interest, or related entity, unless for a commercial purpose, such as tourism or sports-related advertisements;

l.  Describing or promoting a view of the role that any particular group (including groups characterized by their race, religion, ethnicity, nation origin, sexual orientation, disability status, marital status, age, or ideology) has played or should play in any government, society, or country.

m.  Describing or promoting a particular view, interpretation, or meaning of historical events, historical documents (for example, but not limited to, the Declaration of Independence or Constitution), laws, statutes, regulations, or other government policies.

n.  Supporting, opposing, or promoting a rally, protest, march, demonstration, or other similar event that

includes any content that would otherwise be prohibited by the Guidelines.

    o.  Using logo(s), slogan(s), phrase(s), symbol(s), or any other word(s) or image(s) that are otherwise prohibited by the Guidelines, unless solely for a commercial purpose.

    p.  Supporting, opposing, or promoting an ethical, social, or humanitarian cause, mission, call to action, awareness campaign, position statement, or other similar effort unless solely for a commercial purpose.

4. Guideline 9 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, or other media solely because the medium's content addresses political issues or contains political messages, so long as the advertisement does not otherwise violate the Guidelines.

5. Guideline 9 does not prohibit advertisements for employment, including encouraging enlistment in a branch of the military or application for a job with federal, state, or local governments, solely because the employer's missions, policies, practices, or tactics are the subject of "varying opinions," so long as the advertisement does not otherwise violate the Guidelines.

6. Guideline 9 does not prohibit advertisements that encourage or promote the purchase or use of goods or services because others may be opposed to their purchase or use, so long as the advertisement does not otherwise violate the Guidelines.  For example, an advertisement for a fast food restaurant with an image of a hamburger does not violate Guideline 9 because some people may oppose the consumption of meat. Likewise, an advertisement from a charitable or religious organization that provides free meals or services to the poor is not prohibited because some people may be opposed to that organization, so long as the advertisement does not otherwise violate the Guidelines.

7. Guideline 9 does not prohibit advertisements that promote medical services that may be the subject of public debate and controversy (for example, but not limited to, abortion, pregnancy care, gender-affirming medical treatment, in-vitro fertilization, vaccines, etc.) if the advertisement is limited to describing the services available, so long as the advertisement does not otherwise violate the Guidelines.

8. Guideline 9 does not prohibit advertisements soliciting donations so long as the advertisement does not otherwise violate the Guidelines.

H. Interpretive aids for Guideline 12: "Advertisements that promote or oppose any religion, religious practice or belief are prohibited."

1. Guideline 12 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, product, or other media solely because the medium's content addresses religion, religious practices, or religious beliefs or contains religious messages, so long as the advertisement does not otherwise violate the Guidelines.

2. Guideline 12 does not prohibit advertisements for an institution solely because of its affiliation with a religion or because it displays a religious, institutional logo, slogan, phrase, symbol, or any other word(s) or image(s), so long as the advertisement does not otherwise violate the Guidelines.

I. Interpretive aids for Guideline 13: "Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited."

1. Guideline 13 prohibits advertisements that support or oppose industry, trade, or professional group members (for example, but not limited to, aerospace, doctors, manufacturing, organics, green energy, teachers, pilots, etc.) by seeking to influence the public or government policy regarding them without direct commercial benefit to the advertiser.

J. Interpretive aids for Guideline 14: "Advertisements that are intended to influence public policy are prohibited."

1. Guideline 14 prohibits advertisements that seek to influence lawmakers, regulatory agencies, judges, and any other government officials in the conduct of their duties, other than those offering goods and/or services to the government, so long as the advertisement does not otherwise violate the Guidelines.

2. Guideline 14 prohibits advertisements that call on the public to contact, lobby, or otherwise influence lawmakers, regulatory agencies, judges, and any other government officials to support or oppose a matter

under consideration or likely to be considered by them, other than those offering goods and/or services to the government, so long as the advertisement does not otherwise violate the Guidelines.

3. Content that involves "public policy" for purposes of Guideline 14 includes content that is described under Guideline 9.

5